# Exhibit Z

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | | |
|---|---|---|
| HARTFORD CASUALTY INSURANCE, COMPANY, AN INDIANA CORPORATION, | ) ) ) | CASE NO. 3:15-CV-02592-SI |
| PLAINTIFF, | ) ) ) | |
| V. | ) ) | |
| FIREMAN'S FUND INSURANCE COMPANY, A CALIFORNIA CORPORATION, ET AL. | ) ) ) | |
| DEFENDANTS. | ) ) ) | |
| AND RELATED CROSS- AND COUNTER-ACTIONS. | ) | |

# EXPERT REBUTTAL REPORT
## OF
## JAMES A. ROBERTSON, CPCU, ARM

**July 28, 2016**

A. **My Retention and Documents Reviewed**

I have been retained in the above-captioned matter on behalf of Hartford Casualty Insurance Company ("Hartford") through the law firm of Hayes, Scott, Bonino, Ellingson & McLay, LLP. I submitted an expert report in this matter on July 11, 2016. Since submitting my report I have reviewed additional documents, including the Expert Report of Elliott Rothman dated July 11, 2016 ("the Rothman Report") filed on behalf of Fireman's Fund Insurance Company ("FFIC"), and the Expert Report Charles D. Henderson dated July 11, 2016 ("the Henderson Report") filed on behalf of FFIC. I have been asked to provide a rebuttal to certain underwriting opinions expressed in these Expert Reports. I also received the Expert Report of Jeffrey McKinley, whose testimony on behalf of Mosen O'Hadi is primarily with respect to agents' and brokers' standard of care. Any rebuttal to his opinions will be provided by other experts.

The documents I considered in forming my opinions are listed in Exhibit 3 to my previous report. Additional documents which I received and considered since submitting my previous report are attached as Exhibit 1 to this rebuttal report.

B. **Qualifications and Compensation**

My qualifications and compensation were described fully in my previous expert report dated July 11, 2016 and for conciseness are omitted here.

C. **General Disclaimer**

It is my intention to address only certain subjects about which I believe Messrs. Rothman and Henderson to be incorrect, and which may not have been addressed in my Expert Report; I will not be providing an exhaustive refutation of all of the statements with which I disagree. That I do not address any particular assertion in the reports does not mean that I agree with Messrs. Rothman and Henderson about that assertion. I continue to hold all of the opinions expressed in my previous report.

D. **The Henderson Report**

The Henderson Report provides a number of opinions about FFIC's handling of the underlying claim in this matter which are more appropriately addressed as underwriting opinions, not related to claims handling practices per se. The significance of the report focusing on underwriting matters is that Mr. Henderson's entire career appears to have been spent handling claims for various organizations. Nowhere in his report does he describe a basis for rendering an opinion about the underwriting practices which his report addresses, nor does he state that he was retained to do so.

The Henderson Report states that his assignment was to address "(1) Whether Hartford may claim contribution for the excess it paid over its policy limits because of its failure to accept a pre-trial settlement offer within limits; and (2) Whether the FFIC personal lines policy, provide coverage for the business activities of an insured."[1] [sic]

With respect to the first question, Mr. Henderson expresses the opinion that Hartford may not claim contribution from FFIC because it failed to accept a settlement offer within its policy limits. The basis for this opinion appears to hinge on the ultimate issue for the trier of fact related to Hartford's claim for reformation of FFIC policy no. NZA 242 90 23 ("the Excess Policy") issued by FFIC to the Owhadis. If the Excess Policy had been correctly issued, insuring the interests of all of the entities (LLC or other entities) owning the Owhadis' properties, there would have been no question that FFIC would have been providing coverage to Herndon Partners, LLC ("Herndon").

The issue of whether the so-called "998 settlement offer" was reasonable should have been decided based on the combined limits of both Hartford and FFIC available to Herndon. Furthermore, the insurer's judgment of the reasonableness of the offer depended on the insurer's viewpoint with respect to the basis for the claim when compared with the scope of the policy the insurer issued. Not believing the deceased to be an employee, Hartford was justified in acting as if its Worker's Compensation exclusion should apply – the same basis for which Henderson asserts that FFIC was correct in denying the claim. Both insurers should have been able to consider their employee exclusions as valid in this instance.

Mr. Henderson also expressly opines that FFIC correctly denied coverage because of the "business pursuits" exclusion. He states that a "reasonable insurer" would conclude that renovating a home was a business pursuit.[2] This is in fact an opinion about the meaning attached to "business pursuits" by an underwriter, and what is a reasonable interpretation of that term. It strains credulity that home renovations, however characterized — home improvements, home maintenance, home repair, etc. — would not be covered by a homeowner's policy. Mr. Henderson is, in effect, opining that only liability arising out of occupancy of the home by the owner is covered by the policy, and that no other change in the home for which homeowners routinely and customarily contract with independent contractors would be insured. This overly restrictive view of the exclusion is contrary to the custom and practice of the insurance industry with respect to underwriting personal lines policies. If Mr. Henderson's view of the exclusion was adopted by any court, it would be necessary for a homeowner to procure separate coverage every time a contractor was engaged to perform

---

[1] The Henderson Report, p. 2.
[2] The Henderson Report, *ibid.*, p. 12.

work on the home. There is no such common practice throughout the insurance industry. Mr. Henderson's opinion gives the broadest possible meaning to an exclusion in the policy, which is 180 degrees different from the standard customarily applicable to a policy exclusion: that it be construed narrowly in the manner that gives effect to the language of the exclusion without allowing the insurer to benefit from any ambiguity in the meaning of the exclusion.

My report discusses the correct rebuttal to Mr. Henderson's opinion that the deceased worker, Mr. Moreno, was an employee.[3] Mr. Moreno was, in fact, paid by another entity, which purchased Worker's Compensation insurance for him, and he was not reported by Herndon as an employee. Prior to the jury finding no one believed that Mr. Moreno was Herndon's employee.

Furthermore, the renovation of a home does not describe Herndon's business. Herndon was a "passive" entity, merely holding title to the property, and in that capacity, could either buy or sell property. "Renovation," or remodeling or other improvements, do not fall within the definition of "business" which describes excluded activities in the policy. "Business" is defined as "...an occupation, employment, trade, profession, other activity performed in exchange for money or other compensation, including farming or ranching operations and property rental."[4] While Herndon owned the property, its owners could have used the property as a residence or done anything with it, except rent it to others, and it would still would not have been a "business pursuit" use of the home.

The Henderson Report's conclusion that "FFIC correctly and reasonably concluded that there is no coverage under the excess policy because Herndon is not an insured under the excess policy,"[5] ignores the underwriting errors described in my previous report with respect to how FFIC insured the excess limits of coverage for the risks insured under its primary, underlying coverage. There is no issue that the Excess Policy, as written, fails to insure Herndon or the other entities with an interest in the properties for which FFIC charged a premium. When issuing the policy in this manner, FFIC ignored the legitimate expectation of its insured that all of the insurable interests for the insured property, which were covered in underlying insurance, would also be covered in the Excess Policy. FFIC failed to complete this essential coverage requirement, failed to address the requests of the agent (Mosen O'Hadi), failed to make an appropriate investigation of the insurable interests of the properties it purported to insure, and failed to notify any parties that it was issuing

---

[3] Expert Report of James A. Robertson dated July 11, 2016, pp. 6-7.
[4] FFIC policy NZA 335 54 62 at p. HERNDON_FF_PRIMARY_028. See also FFIC Policy NZA 242 90 23 at p. HERNDON_FF_EXCESS_077.
[5] The Henderson Report, *op.cit.*, p. 12.

a more restrictive and deficient form of coverage to the Owhadis than the coverage requested by the Mr. O'Hadi and required by the nature of the insured risk.

Mr. Henderson opines further that "...even if Herndon were deemed to be an insured under the excess policy, such policy still would not provide coverage because, (1) policy precludes coverage for business activities, and also precludes coverage for workers compensation liabilities."[6] This simply repeats the opinions related to the identical exclusions in the underlying policy, which have already been addressed in my previously filed report.

The errors made by FFIC in underwriting the Excess Policy appear to have been a direct result of the way the application was modified by Ms. Hadfield of FFIC.[7] Ms. Bacarti considered herself to be an underwriter, and since she was the conduit for any information that FFIC required to issue the policy, the errors by FFIC appear to have been directly related to the information communicated to FFIC by Ms. Bacarti of Burns & Wilcox.

FFIC charged a premium to insure the liability risk on the property located at 31522 Broad Beach Road ("the Malibu Property"), but now claims that it has no coverage for such liability. It purported to provide insurance for risks which it now denies. This is a textbook example of illusory insurance, as it is understood by insurance professionals and the insurance industry.

E.  **The Rothman Report**

The Rothman Report seems to offer a number of opinions which specifically relate to underwriting, although it appears that Mr. Rothman has only worked as an agent or broker throughout his career. He does not appear to ever have held a position with underwriting responsibilities. The report offers four opinions:

1. Rothman would expect FFIC to deny the claim and/or rescind a homeowners' or excess policy.
2. FFIC or Burns & Wilcox had a right to rely on the representations of the insured and its broker in applying for homeowners' and excess coverage for the Malibu Property.
3. There was no aspect of the underwriting process that would trigger an obligation on the part of FFIC or Burns & Wilcox to perform an investigation exceeding the scope of the ordinary custom & practice of insurers underwriting homeowners and excess policies.

---

[6] The Henderson Report, *ibid.*, p. 13.
[7] June 29, 2016 deposition of Lynn Hadfield, pp. 94-96; 107-109; 190-197.

Expert Rebuttal Report of James A. Robertson, CPCU, ARM                                    Page 5

    4. The policies issued to Mr. Owhadi did not "differ in any way" from that which was requested from FFIC.[8]

The Rothman Report argues that Homeowners/Excess policies are available only for *owner-occupied residential properties*, and that Mr. Owhadi through his broker, Mosen O'Hadi, misrepresented the use of the Malibu Property as a "vacation home" when it was the intent to remodel and sell the property, as was the purpose of the LLC. According to the Rothman Report, this constitutes a "business activity."[9]

Although one would customarily expect an agent or broker to be familiar with the terms of policies they sell, there is no customary practice for agents or brokers to interpret the coverage for the underwriter. What the Rothman Report describes as excluded "business activity" does not, in fact, fall under the terms of the "business pursuits" exclusion or the definition of "business" contained in the FFIC policies.

The Rothman Report fails to address the important paradox presented by his opinion: If coverage is only available for owner-occupied residential properties under the coverage forms used by FFIC, then why did FFIC issue policies covering up to 18 different properties, most of which were clearly identified as rentals when they were added to the FFIC Excess Policy? The personal umbrella application accepted in this instance asked for the address of "all owned, leased or occupied properties, including residences, buildings, farms, vacant land, etc.," and not only "owner-occupied residential properties."[10]

Mr. Owhadi's agent, Mosen O'Hadi, was clear that at the time the policy was requested the property was to be used as a secondary residence, which fell within the permitted uses of property insured under the FFIC forms. If Mr. Owhadi changed his mind about how the property would be used after the policy was issued, there was no requirement to notify the insurer or the agent of this change. Although the change in intended use for the property could have had an impact on a renewal of the policy, it had no effect in coverage during the time it was held for completion of improvements and not rented to others or used for other defined "business pursuits." When questions such as this are present about the intended uses of property, it is not clear that there was an actual misrepresentation, and thus rescission would not be appropriate.

Furthermore, the application originally presented to Burns & Wilcox by Mr. O'Hadi correctly requested that the owner (entity holding title) of the property, Herndon Partners LLC,

---

[8] The Rothman Report, pp. 1-2.
[9] The Rothman Report, *ibid.*, p. 2.
[10] Personal umbrella application (FF000083-87).

should be the named insured. The change in the designation of the insured entity was made by Ms. Hadfield at FFIC following discussions with Ms. Bacarti of Burns & Wilcox. It was their decision to only list Herndon as an additional insured under the Primary Policy, and their decision to not insure Herndon at all in the Excess Policy, even though it is clear that Herndon required the coverage.[11] When changing the name of the insured requested in the application, they failed to inform Mr. O'Hadi that they were leaving the interests of the entity he sought to insure, Herndon, unprotected.

The Rothman Report also states that, "Personal Lines insurance applications are quite specific in their questions and the applications almost always include all of the information needed to underwrite the risk. Thus, the applicant and certainly his broker must be aware that their representations will be, in most cases, the sole basis for underwriting decisions by the insurer and that each party to an insurance contract is entitled to assume the good faith of the other."[12] However, none of the applications used to place coverage at issue in this matter ask for ownership, which would be essential for underwriting the risk if coverage is only available for "owner-occupied residential properties."

The Rothman Report states that "insurers and wholesale brokers do not customarily conduct extensive investigations to verify representations made by the applicants for Homeowners/Excess Liability policies."[13] In many instances, this opinion would be true, but not in this case. There were too many red flags in this matter that should customarily have prompted further inquiries by either Ms. Bacarti or Ms. Hadfield. First, there was the questions (described in my previous report) about whether Herndon held title to the Malibu Property, because the agent, Mosen O'Hadi, had requested that Herndon be the named insured. Second, and perhaps even more important, are the questions raised by the multiples properties listed in the Excess Policy application, which were identified as "rentals." Third, Ms. Bacarti's opinion was that Mosen O'Hadi was "inexperienced," and her testimony suggests perhaps even incompetent,[14] which means that all aspects of the coverages he requested should have been carefully scrutinized and questioned by the underwriter. Such careful scrutiny when such indicators are present falls squarely within the custom and practice of the insurance industry for good underwriting practices.

---

[11]Hadfield deposition, *op.cit.*, pp. 94-96; 107-109; 190-197. See also June 14, 2016 deposition of Donna Bacarti, pp. 51-53.
[12]The Rothman Report, *op.cit.*, p. 2.
[13]The Rothman Report, *ibid.*, p. 2.
[14]Bacarti deposition, *op.cit.*, pp. 35; 45; 115-117.

F.   **Conclusion**

As previously stated, my failure to address any opinion contained in the reports discussed above does not imply agreement with such opinions. I continue to hold all of the original opinions described in depth in my original Expert Report in this matter.

\*   \*   \*   \*   \*

I hold all of the conclusions and opinions expressed in this report with a reasonable degree of professional certainty, and I am not aware of any facts at this time that would change any of these opinions. However, I reserve the right to supplement this report and/or provide additional opinions, subject to methods of analysis and peer review that are customarily used by professional risk management and insurance consultants, or if I am provided with additional facts, testimony or documents for analysis.

Signed this 28th day of July, 2016 at Newport Beach, California.

_____
James A. Robertson, CPCU, ARM

**Exhibit 1**

# SUPPLEMENTAL DOCUMENT INDEX

**Legal Documents**
1. FFIC's First Expert Witness Disclosure, dated July 11, 2016 and attaching the Expert Report of Elliott Rothman with attachments, and the Expert Report of Charles D. Henderson with attachments
2. Expert Witness Disclosure and Expert Report of Cross-Defendant Mosen O'Hadi, dated July 11, 2016 and attaching the Expert Report of Jeffrey G. McKinley, with exhibits
3. Hartford's Expert Witness Disclosures, dated July 11, 2016 and attaching the Expert Witness Declaration of Joshua N. Kastan; the Expert Report of Donald A. Way with exhibits; the Expert Report of James A. Robertson with exhibits; and the Expert Report of Edward J. McKinnon with exhibits